# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| THE LANDING, L.L.C., an Alabama limited liability company, and BAYOU BEND, L.L.C., an Alabama limited liability company.<br><br>          Plaintiffs,<br><br>vs.<br><br>MG AFFORDABLE MASTER, LLC, a Delaware limited liability company, CTCW-ROBERTSDALE LLC, a Delaware limited liability company, and CTCW-BAYOU LA BATRE LLC, a Delaware limited liability company.<br><br>          Defendants. | Case No: 23-CV-377<br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Plaintiffs, The Landing, L.L.C. ("Landing GP") and Bayou Bend, L.L.C. ("Bayou Bend GP" and together with Landing GP, the "General Partners"), for their Complaint against Defendants, MG Affordable Master, LLC ("Special Limited Partner"), CTCW-ROBERTSDALE LLC ("CTCW-Robertsdale"), and CTCW-BAYOU LA BATRE LLC ("CTCW-Bayou" and together with CTCW-Robertsdale, the "Investor Limited Partners"), and state and allege as follows:

## INTRODUCTION

1.     This action seeks a declaration of the rights and obligations of the partners to two Low-Income Housing Tax Credit ("LIHTC") partnerships – Apartment Housing of Robertsdale, Ltd. ("Landing Partnership") and Apartment Housing of Bayou LA Batre, Ltd. ("Bayou Bend Partnership" and together with the Landing Partnership, the "Partnerships") – under their respective partnership agreements.

2.      The Landing Partnership owns and operates a 60-unit affordable housing apartment complex located in Robertsdale, Alabama ("Landing Property") and is governed by an Amended and Restated Agreement of Limited Partnership dated as of December 1, 2006 ("Landing LPA"), a copy of which is attached hereto as **Exhibit A**.  Landing GP is the Landing Partnership's general partner, while MG Affordable Master, LLC is the special limited partner and CTCW-Robertsdale is the investor limited partner.

3.      The Bayou Bend Partnership owns and operates a 55-unit affordable housing apartment complex located in Bayou La Batre, Alabama ("Bayou Bend Property") and is governed by the Amended and Restated Agreement of Limited Partnership, dated as of December 19, 2006 ("Bayou Bend LPA"), a copy of which is attached hereto as **Exhibit B**.  Bayou Bend GP is the Bayou Bend Partnership's general partner, while MG Affordable Master, LLC is the special limited partner and CTCW-Bayou is the investor limited partner.

4.      Upon information and belief, the Investor Limited Partners and the Special Limited Partner (collectively, the "Limited Partners") are pass-through entities with no employees.

5.      Upon information and belief, Hunt Capital Partners, LLC ("Hunt") manages and controls the Limited Partners and may, through affiliates thereof, own some portion or all of the Limited Partners.

6.      Earlier this year, Hunt caused the Special Limited Partner to exercise its rights under the Landing LPA and the Bayou Bend LPA (collectively, the "LPAs") to force the sale of the Landing Property and Bayou Bend Property (collectively, the "Properties").

7.      The General Partners thus caused the Partnerships to market both Properties for sale.

8.      The Partnerships received and, with the consent of all partners, accepted offers to purchase the Properties from third-party buyers and thus entered into Purchase and Sale Agreements to sell both Properties (the "PSAs").

9.      After the Limited Partners had consented to the sale of the Properties as set forth in the PSAs, Hunt caused them to incorrectly assert that the proceeds from the sale of the Properties, after the payment of the Partnerships' debts and expenses associated with the sales, and all other remaining assets of the Partnerships, should be paid entirely to the Limited Partners rather than distributing Sale Proceeds in accordance with Section 9.2 of the LPAs, which expressly govern the "Distribution and Application of Sale or Refinancing Transaction Proceeds."

10.     Pursuant to Section 9.2 of the LPAs, the General Partners are to receive 90% of all residual or net proceeds from the sale of the Properties, whereas the Limited Partners collectively receive 10% of such net sale proceeds.

11.     Hoping to avoid the plain and unambiguous language of the LPAs and divert the sales proceeds from being distributed in accordance therewith, Hunt has caused the Limited Partners to claim that the net sale proceeds from the sale of the Properties must be distributed in accordance with Section 13.4 instead.  Doing so would otherwise create a "cash windfall" for the Limited Partners and ultimately (upon information and belief) Hunt or its affiliates, and otherwise serve to deprive the General Partners of economic rights they specifically bargained for under the LPAs at a time during which Hunt had no management, control, or ownership rights over the Limited Partners.

12.     Hunt's conduct in causing the Limited Partners to take this position in breach of the LPAs is emblematic of a "now-nationally-familiar pattern of tactics" used by "Aggregators" (such as Hunt) to attempt to deprive general partners and low-income communities nationwide from

residual value derived from affordable housing developed under the federal government's Low-Income Housing Tax Credit ("LIHTC") program.  *JER Hudson GP XXI LLC v. DLE Invs., LP*, 275 A.3d 755, 761, 772 (Del. Ch. May 2, 2022); *see also CED Capital Holdings 2000 EB, L.L.C. v. CTCW Berkshire Club, L.L.C.* [hereinafter, "*Berkshire II*"], No. 2018-CA-013886-O, 2020 WL 6537072, at *10 (Fla. Cir. Ct. Nov. 3, 2020) ("parties, like Hunt, have come into LIHTC partnership agreements and attempted to extract value or proceeds that is not otherwise permitted under the operative contracts"), *aff'd sub nom.,* 330 So.3d 991 (Fla. 5th DCA 2021) (per curiam); *CED Capital Holdings X, Ltd. et al. v. CTCW-Waterford East, L.L.C.* [hereinafter, "*Waterford II*"], No. 2019-CA-002758-O, 2023 WL 3436906, at *11-13 (Fla. Cir. Ct. May 8, 2023).

13.    Accordingly, the General Partners seek a declaration of the rights and obligations of the partners under the LPAs, including, without limitation, that: (i) the proceeds from the sale of the Properties pursuant to the PSAs shall be distributed to the Partnerships' partners pursuant to Section 9.2 of the LPAs, not Section 13.4; and (ii) the Partnerships' remaining assets shall thereafter be distributed pursuant to Section 13.4 of the LPAs when the Partnerships are subsequently wound up and dissolved next year.

## PARTIES

14.    The Landing GP is an Alabama limited liability company and is the sole general partner of the Landing Partnership.  The Landing GP's principal place of business is located at 6801 Lee Road 54, Auburn, Alabama, 36830.  The Landing GP's sole member is Apartment Developers, Inc., an Alabama corporation, with the same principal place of business as the Landing GP.  The Landing GP is a citizen of Alabama.

15.    Bayou Bend GP is an Alabama limited liability company and is the sole general partner of Bayou Bend Partnership.  Bayou Bend GP's principal place of business is located at 6801 Lee Road 54, Auburn, Alabama, 36830.  Bayou Bend GP's sole member is Apartment

Developers, Inc., an Alabama corporation, with the same principal place of business as the Bayou Bend GP. The Landing GP is a citizen of Alabama.

16.    Defendant MG Affordable Master, LLC is a Delaware limited liability company, with its principal place of business at Hunt's headquarters at 15910 Ventura Blvd., Ste. 1100, Los Angeles, CA 91436. Upon information and belief, none of the members of the MG Affordable Master, LLC are citizens of the State of Alabama.

17.    Defendant CTCW-Robertsdale is a limited liability company formed and existing under the laws of the State of Delaware, is the Investor Limited Partner of the Landing Partnership, and, upon information and belief, is owned by a tax credit fund named MG GTC Middle Tier I, LLC. CTCW-Robertsdale's principal place of business is located at Hunt's headquarters at 15910 Ventura Blvd., Ste. 1100, Los Angeles, CA 91436. Upon information and belief, none of the members or owners of CTCW-Robertsdale are citizens of the State of Alabama.

18.    Defendant CTCW-Bayou is a limited liability company formed and existing under the laws of the State of Delaware, is the Investor Limited Partner of the Bayou Bend Partnership, and, upon information and belief, is owned by MG GTC Middle Tier III, LLC. CTCW-Bayou's principal place of business is located at Hunt's headquarters at 15910 Ventura Blvd., Ste. 1100, Los Angeles, CA 91436. Upon information and belief, none of the members or owners of CTCW-Bayou are citizens of the State of Alabama.

## JURISDICTION, VENUE, AND CHOICE OF LAW

19.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between all Plaintiffs and all Defendants, and the amount in controversy exceeds $75,000. Specifically, Plaintiffs are citizens of Alabama and Defendant is a citizen of Alabama.

20.     This Court is the proper venue for this action pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, in the Southern District of Alabama.

21.     Pursuant to Section 15.1 of the LPAs, the LPAs shall be construed and enforced in accordance with the laws of the State of Alabama.

## FACTUAL ALLEGATIONS

### I.     The Low-Income Housing Tax Credit Program

22.     Because the claims presented "are intertwined with LIHTC—a highly complex, unique federal program—some background into the mechanics of LIHTC is needed." *SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*, 33 F.4th 872, 873-74 (6th Cir. 2022); *accord JER Hudson*, 275 A.3d at 763.

23.     The low-income housing tax credit (the "Tax Credit")—made available through the LIHTC Program—is a federal tax credit that is generated from certain multi-unit housing projects that satisfy a number of requirements, including, without limitation, an agreement by the property owner to rent, for a statutorily prescribed period of time, certain units to households with incomes below certain qualified limits at rents that do not exceed federally-mandated maximums.

24.     The LIHTC Program is governed by 26 U.S.C. § 42 ("Section 42"), certain Treasury Regulations, guidance from the United States Department of Treasury and the Internal Revenue Service, and state-specific procedures contained in various documents adopted by designated housing agencies in each state (collectively, the "Tax Credit Rules").

25.     Congress enacted the LIHTC program in 1987 to address the shortage of affordable housing in the U.S. *See Pathway of Pontiac*, 33 F.4th at 874.

26.     The key feature of the LIHTC program is the Tax Credit, which provides a generous dollar-for-dollar tax liability offset, thus incentivizing large institutional investors with large tax liabilities—often banks or insurance companies—to invest capital in the development of affordable housing.  *Id.* (citing H.R. Rep. No. 101-247, 101st Cong., 1st Sess., at 1188 (1989) (giving "tax incentives to private investors...is the most appropriate way to achieve th[e] aim" of increasing affordable housing)).

27.     Because developers rarely have sufficiently large, predictable tax obligations to make use of Tax Credits, the LIHTC program facilitates the "sale" of these Tax Credits to tax credit investors in exchange for capital needed to develop the property.  *Id.*; *Low-Income Housing Tax Credits: Affordable Housing Investment Opportunities for Banks*, Office of the Comptroller of the Currency [hereinafter "Comptroller Report"], at 3, 23 (March 2014)[1]; Keightley, *An Introduction to the Low-Income Housing Tax Credit*, Congressional Research Service [hereinafter, "CRS Report RS22389"], at Summary & 1, 5 (Jan. 26, 2021)[2]; Khadduri *et al.*, *What Happens to Low-income housing Tax Credit Properties at Year 15 and Beyond?*, U.S. Department of Housing and Urban Development ("HUD") [hereinafter, "Year 15 HUD Report"], at 25 (August 2012).[3]

28.     Generally, in a low-income housing project (a "project"), the project owner is organized as a limited partnership or limited liability company (the "project partnership"—here, the Partnerships), in which a "project sponsor" (which may be a for-profit developer—here, the General Partners—or a non-profit organization) acts as the general partner or managing member of the project partnership.

---

[1]     *Available at* https://www.occ.gov/publications-and-resources/publications/community-affairs/community-developments-insights/ca-insights-mar-2014.html.
[2] *Available at* https://sgp.fas.org/crs/misc/RS22389.pdf.
[3] *Available at* https://www.huduser.gov/publications/pdf/what_happens_lihtc_v2.pdf.

29.    The project sponsor first obtains an allocation of Tax Credits on behalf of the project partnership by engaging in a complex, "extremely competitive" application process. Comptroller Report at 24, CRS Report RS22389 at 4; Year 15 HUD Report at 56; *Pathway of Pontiac*, 33 F.4th at 874.

30.    Once the Tax Credits are awarded, the project partnership becomes entitled to collect the Tax Credits over a ten-year period following the project being "placed in service," known as the "Credit Period"; however, to secure the Tax Credits from "recapture" by the IRS, the project partnership must comply with complex federal rent restrictions for a concurrently running fifteen-year period, known as the "Compliance Period."  Comptroller Report at 3, 23; CRS Report RS22389 at 4; Year 15 HUD Report at xiii, 29.

31.    For Tax Credits awarded after 1989 (as here), a project partnership must also comply with rent restrictions for, at minimum, an additional fifteen-year period after the end of the Compliance Period, known as the "Extended Use Period."  However, the Tax Credits are fully secured as of the conclusion of the Compliance Period and there is no risk of recapture during the Extended Use Period.  *Id.*

32.    If the project sponsor secures an award of Tax Credits through this highly competitive process, it may then admit a tax credit investor into the existing project partnership through a carefully negotiated agreement whereby the existing partnership agreement is amended and restated to govern, among other things, the parties' rights and obligations.

33.    The tax credit investor is admitted as a limited partner (often through a single-purpose, pass-through entity, as explained below) based on an agreement to make capital contributions to the project partnership specifically in exchange for the allocation of substantially all (usually 99 percent-plus) of the Tax Credits awarded, along with certain other expected tax

benefits (primarily, income losses and property depreciation deductions). *E.g.*, *JER Hudson*, 275 A.3d at 764-65 ("[D]evelopers 'sell' the tax credits to private investors, usually through a syndicator, in exchange for an equity investment in the housing project."); *Pathway of Pontiac*, 33 F.4th at 874.

34.    Because the amount of capital invested is based on the amount of Tax Credits and other tax benefits forecasted to be received—*not* cash flow or resale profits (*i.e.*, residual value) from the real estate—the amount invested as a capital contribution is referred to in the LIHTC industry as the "price" paid for the Tax Credits. Comptroller Report at 23; *see also id.* at 22 ("LIHTC investors receive financial benefits on their investments through the [Tax Credits], as well as the additional deductions from real estate losses."); CRS Report RS22389 at 6 (explaining that rather than looking to cash benefits, "investors look to the credits, which will be used to offset their income tax liabilities, as their return on investment…. The larger the difference between the market price of the credits and their face value ($1.00), the larger the return to investors….").

35.    Because tax benefits (*i.e.*, Tax Credits and tax losses) flow to partners in accordance with their respective ownership interest percentages in the project partnership, the tax credit investor is given 99 percent-plus of the ownership interests in the project partnership. Comptroller Report at 3; CRS Report RS22389 at 5; Year 15 HUD Report at 25, 32.

36.    The tax credit investor assumes only a "passive," restricted role in the operations and management of the project and project partnership. *AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp.*, 15 F.4th 551, 553 (1st Cir. 2021); *Pathway of Pontiac*, 33 F.4th at 874-75, 881; *JER Hudson*, 275 A.3d at 766).

37.    Correspondingly, project sponsors typically hold 1 percent or less of the ownership interests in the project partnership; however, as the general partner or managing member, they

assume all responsibility for the operations of the project partnership and the project's development, management, and compliance with the LIHTC program for the life of the project—and in no event less than the fifteen-year Compliance Period necessary to secure the Tax Credits and other tax benefits for the tax credit investor. Year 15 HUD Report at 25; *see also* Comptroller Report at 3, 16; CRS Report RS22389 at 6.

38.     The project sponsor also assumes most of the risk associated with investing in the Tax Credits by providing investors with completion, operating, and tax delivery guarantees, with an unconditional guarantee of construction completion being most important because an unfinished project cannot produce Tax Credits. Comptroller Report at 17, 24. Such agreements effectively act as "guarantees on investment yields" for the tax credit investor. *Id.*

39.     Frequently (as here), the tax credit investor invests in the project partnership through a pass-through, "disregarded entity" (a "single-purpose limited partner entity"; here, the Investor Limited Partners) that has no independent operations, bank accounts, employees, employment identification numbers (EINs), or the like.

40.     The single-purpose limited partner entity's sole purpose is to facilitate the tax credit investor's investment in the project partnership.

41.     Often (as here), the single-purpose limited partner entity is wholly-owned by an upper-tier tax credit fund (a "tax credit fund"), which tax credit fund is itself usually a limited partnership or limited liability company in which the tax credit investor owns a passive limited partner or member interest. That tax credit fund is often the owner of numerous single-purpose limited partner entity interests in project partnerships, and the benefits received from those project partnerships pass-through the single-purpose limited partner entity to the tax credit fund, which

then distributes the benefits to the tax credit investor at the upper-tier level pursuant to the agreement(s) governing the tax credit fund.

42.    For example, a typical syndicated tax credit fund structure is depicted follows:



Comptroller Report at 4, 17 ("Figure 2 illustrates the typical legal structure for an investment in a syndicated LIHTC equity fund.  The syndicator organizes one or more investors and forms an investment fund, and the fund invests in one or more affordable housing projects.  Thus, a two-tier partnership structure is created with funds from investors combining in the upper-tier investment

partnership and funds from pooled equity financing multiple, lower-tier property partnerships. Investors hold 99.99 percent ownership of the investment fund; the syndicator, as general partner or managing member, holds 0.01 percent ownership. . . . The tax credits flow from the lower-tier partnerships to the upper-tier partnership, where investors share the tax credits….").

43.     Also often (as here), the tax credit fund seeks to admit to the project partnership as a special limited partner an affiliate of the tax credit fund (originally, Column Affordable Master, LLC; now, Defendant MG Affordable Master, LLC).

44.     This special limited partner is often the general partner or managing member of the upper-tier tax credit fund and owes a fiduciary duty to the tax credit investor to manage its investment in the project-level partnership(s) that own the project(s) and receive(s) the Tax Credits.

45.     This special limited partner entity is owned by what is commonly referred to in the LIHTC industry as a "syndicator," which effectively serves as the middleman between developers and tax credit investors by locating developers who have been awarded an allocation of Tax Credits and negotiating for, and agreeing to thereafter manage for a fee, the tax credit investor's investment in the Tax Credits.   Comptroller Report at 17 ("Syndicators often include the underwriting guidelines used for the acquisition of investments in the fund offering documents.   These guidelines may include minimum rates of return, debt coverage ratios, and reserves.  In some cases, syndicators may be required to inform investors of deviations from these guidelines.").

46.     The syndicator is immediately compensated for its middleman efforts by the one-time markup of the per-dollar "price" paid by its tax credit investors for the Tax Credits awarded to the project partnership.  *See id.*

47.     The special limited partner entity admitted to the project partnership usually has little or no ownership stake in the project partnership, contributes a nominal amount for its admission, and its role consists of passively holding the contingent right to become an additional general partner and take over management of the project partnership in the event that the project sponsor's management places at risk the receipt of the Tax Credits due to the failure to operate in compliance with the Tax Credit Rules and/or the parties' governing documents. *Id.* at 22.

48.     A tax credit investor's investment in a LIHTC partnership or fund is thus a tax credit investment, rather than a traditional real estate investment.

49.     At the end of the 15-year Compliance Period ("Year 15" or "back end"), the tax credit investor limited partner has collected all Tax Credits and other desired tax benefits, and those benefits are fully secured from recapture by the IRS.

50.     Consequently, tax credit investors customarily seek to exit the partnership by the end of the Compliance Period because "the greatest benefits of ownership" are "both gone and safeguarded," leaving "little economic motivation to stay in the deal."  Year 15 HUD Report at 25, 29 ("[I]t is in the interest of limited partners (LPs) to end their ownership role quickly after the compliance period ends.  They have used up the tax credits by Year 10, and after Year 15 they no longer are at risk of IRS penalties….[A]s a matter of policy, [syndicators and direct investors] work to engineer an investor exit as quickly as possible after [Year 15].");  Comptroller Report at 3 ("Most often, investors exit between year 11 and 16, having collected [the Tax Credits].");  *AMTAX Holdings 227*, 15 F.4th at 553-54 ("At the end of the compliance period, the time may be ripe for the investor to bid farewell….").

51.     As has been well-documented, Year 15 exits of the tax credit investor limited partner are carefully structured to compensate *the project sponsor* for its 15-plus years of work,

risk, and stewardship over the life of the partnership and project by granting the project sponsor the vast majority of potential equity that may have appreciated over time in the project, while the tax benefits over that same period of time were given to the tax credit investor.

52.    One such mechanism for exiting limited partners and compensating the project sponsor for its 15-plus years of services is upon a potential sale of the project. *See* Year 15 HUD Report at 29 ("[The LP's] exit can be accomplished by selling the [LP] interests (usually to the existing [GP]) or by selling the property (either to the existing [GP] or to a third party).").

53.    To that end, and as relevant here, tax credit investors customarily agree—pursuant to a "sale and refinance" or "capital transaction" waterfall provision—that a project sponsor receives the super-majority of residual proceeds, if any, generated by any sale (or refinance) of the project. *See, e.g.*, *Centerline/Fleet Housing Partnership, L.P. – Series B, et al. v. Hopkins Court Apartments, L.L.C.* [hereinafter, "*Hopkins Court*"], Ca. No. 20-00299, 2020 WL 201150 (N.Y. Sup. 2020), *aff'd*, 195 A.D.3d 1375, *rearg. denied*, 198 A.D.3d 1339 (2021); *Saugatuck, LLC v. St. Mary's Commons Assocs., L.L.C.* [hereinafter, "*St. Mary's*"], Ca. No. 19-CV-217-SIL, 2022 WL 3699484, at *7 (E.D.N.Y. Aug. 26, 2022); *CED Capital Holdings X, Ltd. et al. v. CTCW-Waterford East, L.L.C.* [hereinafter, "*Waterford I*"], No. 2019-CA-002758-O, 2022 WL 1717946, at *3-4, 10-11 (Fla. Cir. Ct. May 12, 2022); *CED Capital Holdings 2000 EB, L.L.C v. CTCW-Berkshire Club, LLC* [hereinafter, "*Berkshire I*"], 2020 WL 1856259, at *4 (Fla. Cir. Ct. April 8, 2020), *aff'd*, 306 So. 3d 103 (Fla. 5th DCA 2020) (per curiam); *see also Berkshire II*, 2020 WL 6537072, at *7, 11; *Urban 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 431 F. Supp. 3d 995, 999-1000 (N.D. Ill. 2020); *Hidden Hills Mgmt., LLC v. AMTAX Holdings 114, LLC*, Ca. No. No. 3:17-CV-06048-RBL, 2019 WL 3297251, at *3 (W.D. Wash. July 23, 2019); *Arch*

*Apartment Mgmt. L.L.C. v. AMTAX Holdings 224, LLC*, Ca. No. 19-0421, 2019 WL 4745331, at *3-4 (Minn. Ct. App. 2019).

54.    While the tax credit investor receives (i) a substantial yearly return on its investment during the Compliance Period in the form of Tax Credits and other tax benefits with virtually no involvement in the owner entity or project, and (ii) minimal annual economic benefits during the Compliance Period, the project sponsor or its affiliate is obligated to provide development and management services, which are subject to risk based on the project's performance and could result in modest fees that offer little to no profit margin, could be deferred, and may only be paid out if the project generates sufficient cash flow to pay them.

55.    Because "the LIHTC program's design provides incentives for property managers to operate on very thin margins, with net cash flow frequently near zero," and because "positive cash flow reduces the value of the depreciation deductions" inuring to the benefit of the tax credit investor, these deferred development fees are sometimes never received and effectively serve as capital contributions by project sponsors.  Year 15 HUD Report at 11, 44-45 & n.25.

56.    The project sponsor and/or its affiliate is also the guarantor of the flow of Tax Credits, any negative adjustors, and operating losses.  Thus, the project sponsor and/or its affiliate assumes significant financial risk in the project during the Compliance Period and its receipt of the super-majority of economic benefits that may be generated by the Partnership during the Compliance Period or afterwards is the primary benefit of its bargain.

57.    The project sponsor also undertakes this investment of time, resources, and money, as well as its duties and obligations, with the expectation that it will have the option and right to acquire either full ownership of the project partnership as a going concern or the project itself at the end of the Compliance Period at an often minimal, formulaic price.

58.     Correspondingly, the tax credit investor customarily does not expect, nor project, any material cash payment upon its exit, including in connection with the sale of the project.

59.     As HUD recognized in 2012, the LIHTC industry has evolved to the point that tax credit investors now receive "little or no residual value or return of capital."  Year 15 HUD Report at 76 ("Syndicators and industry observers describe a shift over time in the nature of LIHTC investment agreements. . . . The industry has evolved to the point that benefits offered to investors now often include little or no residual value or return of capital.").  This was the case when the Investor Limited Partners negotiated for their admission to the Partnerships, wherein the General Partners were both granted the right to receive 90% of the net proceeds available from the sale, refinancing or other disposition of all or substantially all of the assets of the Partnerships.

60.     The "little or no residual value or return of capital" to tax credit investors acknowledged by HUD has even been recognized and allowed by the IRS because, by Year 15, investors have already received the predictable, materially beneficial return on investment through Tax Credits and other tax benefits that Congress intended.

61.     The IRS has promulgated 26 C.F.R. § 1.42-4, a regulation that expressly excepts Tax Credits from section 183 of the Internal Revenue Code ("section 183"), which disallows tax deductions and tax credits when an individual or entity subject to pass-through taxation engages in activity with no intent to profit but instead only to mitigate tax obligations.  In the preamble to this regulation, the IRS stated:

> Although no explicit reference is contained in section 42 or its legislative history regarding its interaction with section 183, the legislative history of the [Tax Credit] indicates that Congress contemplated that tax benefits such as the credit and depreciation would be available to taxpayers investing in low-income housing, even though such an investment would not otherwise provide a potential for economic return.  Therefore, to reflect the congressional intent in enacting section 42, the regulatory authority under section 42(n) is being exercised to provide that section 183 will not be used to limit or disallow the credit.

T.D. 8420 (57 F.R. 24749-24750) (June 11, 1992).

62.    Courts around the country have also recognized that investors in LIHTC partnerships invest in Tax Credits and other tax benefits, not the underlying real estate.  *See, e.g.*, *Pathway of Pontiac*, 33 F.4th at 874, 881 (noting the tax "benefits alone provide the investor with a significant return on investment that makes the arrangement attractive and worthwhile" and that the purpose of a typical LIHTC partnership is "for [the investor] to reap the benefits from the housing tax credits, not from the Property's long-term appreciation gains," as "evinced by the fact that [the investor limited partner's] role in the Partnership was meant to be entirely passive"); *JER Hudson*, 275 A.3d at 766 ("Section 42 advances the deliberate policy choice to replace a typical equity investor's expectations of economic cash flow or appreciation from the apartment complex with a comparable or better return on investment almost solely derived from tax benefits." (quoting *Opa-Locka Cmty. Dev. Corp. v. HK Aswan, Inc.*, Ca. No. 2019-16913-CA-01, 2020 WL 4381624, at *3 (Fla. Cir. Ct. July 7, 2020), *aff'd sub nom.*, 2021 WL 4190914 (Fla. Dist. Ct. App. Sept. 15, 2021)); *see also* Year 15 HUD Report at 24, 82 (noting "reduced expectations of cash flow and resale potential" is "inherent in the design of the LIHTC program" and "the [Tax Credit] compensates investors" for this).

63.    The Sixth Circuit Court of Appeals has recognized these carefully negotiated exits and associated economic sharing arrangements are "crucial to the efficacy of the LIHTC program" in that they allow developers to utilize the appreciated equity for which they bargained to refinance the property, make needed repairs and continue operating the housing in good condition after the tax credit investor's exit, and/or invest in the creation of new affordable housing projects through continued participation in the LIHTC program, which hinges upon developer participation.  *See Pathway of Pontiac*, 33 F.4th at 875; *see also* Comptroller Report at 14 ("[L]imited partners should

factor into their establishment of the exit price the general partner's need to maintain the requisite restricted rents…."); Year 15 HUD Report at 30 (same); *Waterford I*, 2022 WL 1717946 at *4 (noting Aggregator tactics aimed at "forc[ing] a buyout of [LP] interests…at a higher price" can place LIHTC "partnerships and their residents at risk").

64.    It is well-documented that participation in the LIHTC program results in the formation of a unique business arrangement, governed by unique, carefully negotiated contracts that alter the typical bargained-for exchange in conventional real-estate business ventures. *E.g.*, Zaner, *The low-income housing tax credit*, National Real Estate Investor (April 1, 1996)[4] ("Investors are not looking at these [LIHTC] properties to generate traditional real estate benefits in the same way as conventional multifamily investments – it's not the cash flow they're looking at - but the ability to reduce their federal tax liability.").

65.    The General Partners invested in and took on considerable risk from the Partnerships and dutifully served as the General Partners with these understandings and expectations, and, upon information and belief, the original owners of and investors in the Investor Limited Partners agreed with and had the same understandings and expectations.

66.    Without the rights in the residual value of the Properties afforded to them, the General Partners would have little incentive to participate in, and otherwise would not have participated in, the Partnerships and would be deprived of a primary economic right that the parties had originally negotiated and agreed to upon the original tax credit investors' admission into the Partnerships.

67.    Upon information and belief, the original tax credit investors that invested through the Investor Limited Partners did not project or expect upon their admission into the Partnerships

---

[4] *Available at* https://www.nreionline.com/mag/low-income-housing-tax-credit.

that they would receive much, if any, residual proceeds from the sale of the Properties following the end of the Compliance Period.

68.    Upon information and belief, the original tax credit investors that invested through the Investor Limited Partners did not project or expect upon their admission into the Partnerships that they would receive a return of their capital contributions or their projected capital account balances upon their exit from the Partnerships following the end of the Compliance Period.

69.    Upon information and belief, the investment projections prepared by the original tax credit investors and/or shared with the original tax credit investors concerning their investment in the Partnerships did not ascribe any residual value to the Investor Limited Partners' interests in the Partnerships upon a sale of the Properties or otherwise.

70.    Upon information and belief, rather than in consideration of any residual value that may accrue or appreciate over time in the Properties, the amount of the original tax credit investors' capital contributions to the Partnerships here was determined based upon the anticipated tax benefits to be received by Investor Limited Partners and passed on to the tax credit investors.

71.    Upon information and belief, the original tax credit investors that invested through the Investor Limited Partners understood and expected to exit the Partnerships after exhausting their Tax Credits and other tax benefits.

## II.    The Emergence of Aggregators and the "Aggregator's playbook"

72.    As has been well-documented by state housing agencies and a mounting "body of [federal and state] law," there is a growing list of entities—"dubbed 'aggregators'"—who have "been acquiring investor interests in LIHTC partnerships *en masse.*" *Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*,

Washington State Housing Finance Commission ["WSHFC Report"], at 1 (September 2019) (emphasis added).[5]

73.    These "Aggregators" engage in a "now-nationally-familiar pattern of tactics" seeking to strip value from affordable housing and seize contractual benefits for which neither they nor the original tax credit investor bargained or labored, and which Congress did not intend for them.  *Id.*; *JER Hudson*, 275 A.3d at 761 (discussing, in a 100-page "precedential opinion," the "now-nationally-familiar pattern of tactics" engaged in by Aggregators and the growing "body of law" concerning such tactics).

74.    The "public's particular interest" in the tactics of Aggregators and their detrimental impact on affordable housing nationwide has also been "well-documented."  *Saugatuck, LLC v. St. Mary's Commons Assocs., L.L.C.*, Ca. No. 19-CV-217-SIL, 2023 WL 2698061, at *2 (E.D.N.Y. March 29, 2023) (collecting authorities, including *Notice of Funding Availability: March/April 2021*, Massachusetts Dep't of Housing and Community Develop. (indicating that, to obtain a Tax Credit allocation, an "investor cannot have been involved in any 'aggregator' activity, in Massachusetts or in other states"[6])).

75.    In general, the "Aggregator's playbook" consists of utilizing "burdensome tactics that take advantage of legal ambiguities, resource disparities, and economies of scale," and pushing "unsupported positions" to extort economic benefits not provided for by the parties' contracts. WSHFC Report at 1, 5-6; *Berkshire II*, 2020 WL 6537072 at *5-6, 10 (finding Hunt's (*i.e.*, the Aggregator's) actions and "motivations were in bad faith and in direct conflict with the [original investor's] financial expectations and entitlements" regarding the "negotiated residual value upon its exit from the Partnership," and concluding: "this type of activity has become more common in

---

[5] *Available at* https://www.wshfc.org/admin/Reporton15YearTransferDisputes.pdf.
[6] *Available at* https://www.mass.gov/doc/nofa-rental-housing-rapid-production-initiative/download.

the LIHTC industry and the Court's decision here is in accord with decisions from other, similar cases in different jurisdictions where parties, like Hunt, have come into LIHTC partnership agreements and attempted to extract value or proceeds that is not otherwise permitted under the operative contracts like the Partnership Agreement here" (collecting cases evidencing the "Aggregator's playbook")).

76.    More specifically, and as particularly relevant here, the Aggregator's playbook frequently includes "attempt[ing] to extract value out of [limited partner] interests that were not intended by the original parties to the partnerships" by, *inter alia*, "challeng[ing] the contractual transfer rights associated with those partnerships." *JER Hudson*, 275 A.3d at 772 & n.78 (quoting *Full Circle Villagebrook GP, LLC v. Protech 2004-D, LLC*, Ca. No. 20-C-7713, 2021 WL 4061744, at *1 (N.D. Ill. Sept. 7, 2021) and collecting authorities).

77.    The Aggregator's playbook also commonly includes a corresponding, "bad faith" assertion that the passive, restricted limited partner interests since acquired by the Aggregator should be valued based upon a liquidation of the LIHTC partnership and a payout to the limited partner in accordance with its capital account balance—a bookkeeping entry reflecting the capital that the original tax credit investor invested in the Partnerships in specific exchange for millions of dollars' worth of Tax Credits and other tax benefits (not cash flow or residual property value). *E.g.*, *Waterford I*, 2022 WL 1717946 at *2-3, 5, 7, 10-11 & n.2.

78.    Hunt – who controls the Limited Partners – has tried to run the same play from the Aggregator's playbook that it is attempting to run again here, which was determined to be wrongful and in breach of the applicable partnership agreement. *See id.*; *see also id.* at *3; *accord Berkshire II*, 2020 WL 6537072 at *5-6, 10.

79.    Others, with whom Hunt was previously affiliated, have done the same. *See Hopkins Court*, 195 A.D.3d at 1375-78 (same); *St. Mary's*, 2022 WL 3699484 at \*7-8.

80.    Aggregators frequently acquire ownership and/or control of the project partnership's limited partner entities—almost always without the consent of the project sponsor—by acquiring the tax credit investor's and/or syndicator's interests in the upper-tier tax credit fund and/or becoming the "asset manager" of one or more of those entities. *See JER Hudson*, 275 A.3d at 774-77. Aggregators then pursue unintended cash windfalls at the project partnership level, despite such actions being contrary to the authorized purposes of the upper-tier tax credit fund. *Id.* at 798.

81.    Aggregators also sometimes acquire, through affiliates, the tax credit investor's interest in the tax credit fund that owns the investor limited partner in the lower-tier partnership at issue. In doing so, the Aggregator and its affiliates attempt to benefit from any unintended cash windfalls it can create through use of the Aggregator playbook.

82.    At least one court has found that Hunt is an Aggregator.

83.    According to its website, Hunt maintains a "dispositions team" that is "responsible for the sale of Hunt Capital Partner's investors' interests in LIHTC assets" and they "create and execute liquidation strategies, typically after the 15-year LIHTC compliance period expires…."[7]

84.    The "strategies" employed by Aggregators, like Hunt highlights, presents a concerning trend in the affordable housing industry wherein ownership and/or management of the tax credit investors interests changes hands and new managers seek to undermine the purchase options agreed to by the original parties as set forth in their contractual agreements.

---

[7] *Available at* https://huntcapitalpartners.com/for-investors/ (last visited September 29, 2023).

### III.    The Landing and Bayou Bend Partnerships and the Upper Tiers

85.    In 2006, the Partnerships were, respectively, initially organized to acquire, construct, rehabilitate, develop, repair, improve, maintain, and operate the Properties.

86.    The General Partners were and continue to be the Partnerships' original project sponsors and General Partners.

87.    Both Properties were to be acquired, developed, and operated in such a manner as to qualify for Tax Credits.

88.    In 2006, the General Partners reorganized both Partnerships and CTCW-Robertsdale and Column Affordable Master, LLC (n/k/a MG Affordable Master LLC) were admitted to the Landing Partnership as the Investor Limited Partner and Special Limited Partner, respectively.  (Landing LPA p.2)  Likewise, CTCW-Bayou and Column Affordable Master, LLC (n/k/a MG Affordable Master LLC) were admitted to the Bayou Bend Partnership as the Investor Limited Partner and Special Limited Partner, respectively.  (Bayou Bend LPA p.2)

89.    Upon information and belief, CTCW-Robertsdale is wholly owned by a tax credit fund named MG GTC Middle Tier I, LLC ("Middle Tier Fund 1").  Upon information and belief, Middle Tier Fund 1 has two members – the Special Limited Partner is the managing member and another tax credit fund named MG GTC Fund I, LLC ("Upper Tier Fund 1") is the investor member.  The Upper Tier Fund 1 also has two members – the Special Limited Partner is the managing member and an investor member (which as explained below was a tax credit investor that, in 2019, sold its investor member interest to a Hunt affiliate for $10,000).  *See Waterford II*, 2023 WL 3436906 at *4 (describing Middle Tier Fund 1 and Upper Tier Fund 1).

90.    Upon information and belief, CTCW-Bayou is also wholly owned by a tax credit fund named MG GTC Middle Tier III, LLC ("Middle Tier Fund 3").  Upon information and belief, based on the structure used by Middle Tier 1, Middle Tier Fund 3 also has two members – the

Special Limited Partner is the managing member and another tax credit fund, likely named MG GTC Fund III, LLC ("Upper Tier Fund 3"), is the investor member. As with Upper Tier Fund 1, it likely also has two members – the Special Limited Partner as the managing member and an investor member (which may or may not be owned by a Hunt affiliate).

91.    Neither Hunt nor any Hunt affiliate was the original syndicator or the original tax credit investors that invested in either of the Partnerships through the Investor Limited Partners, and thus took no part in the negotiation of the LPAs.

92.    Neither the original syndicator nor the original tax credit investor remain involved with the Landing Partnership because Hunt or its affiliates acquired their interests, as detailed further below.

93.    Neither Hunt nor any Hunt affiliate has made any capital investment in either of the Partnerships or the Properties at any point in time.

94.    Consistent with the well-settled structure and intent of a LIHTC partnership, the LPAs both reflect that the original tax credit investors, through the Investor Limited Partners, made their capital contributions specifically in exchange for the receipt of 99.98% of the projected Tax Credits and other tax benefits secured by the General Partners' efforts. (LPAs §§ 10.7D.)

95.    Under the LPAs, the original tax credit investors received 99.98% of their Tax Credits through the Investor Limited Partners. (*Id*.)

96.    If the General Partners failed to satisfy the conditions necessary to secure the Tax Credits, then they would be forced to "repurchase" the Investor Limited Partners' interests for 110% of the amount of the capital contributions made, plus interest. (LPAs §§ 3.8)

97.    Further consistent with the typical bargained-for exchange in a LIHTC partnership, the General Partners and their owners guaranteed the completion of construction, the payment of

construction overruns, and the funding of operating deficits, as is crucial to securing the Tax Credits.  (LPAs at Ex. B)

98.     The General Partners and their owners also guaranteed the ultimate receipt of a certain sum of Tax Credits for each of the Partnerships by agreeing to make "Federal Tax Credit Shortfall Payments."  (LPAs §§ 4.10.D.; *see also id.* §§ 9.2(iii) (noting that distributions would first be used to pay any Tax Credit Shortfall Payments)).

## IV.    Hunt's Acquisition of Interests in the Investor Limited Partners and Special Limited Partner

99.     Pursuant to factual findings made by a Florida state court in a similar case involving Hunt and an investor limited partner it managed, "[i]n October 2018, [Hunt] acquired control of CTCW and [Middle Tier Fund 1 and Upper Tier Fund 1], when its parent entity, Hunt Companies, Inc., purchased Morrison Grove Management.  Hunt's other affiliate, Hunt LIHTC Holdings, LLC, presently owns Morrison Grove Management."  *Waterford II*, 2023 WL 3436906 at *4**.**

100.    The Florida state court also determined that, "[i]n December 2019, an affiliate of Hunt acquired the investor member interest in the [Upper Tier Fund 1] from Goldman Sachs for a $10,000 purchase price, and thus Hunt's affiliates thereby owned and controlled the entirety of the group of entities in CTCW's ownership chain."  *Id.*  That same group of entities owns CTCW-Robertsdale.

101.    Upon information and belief, when Hunt affiliates acquired Morrison Grove Management in 2018, Hunt also acquired control of Middle Tier Fund 3 and Upper Tier Fund 3, which own CTCW-Bayou.  It is unknown whether Hunt or its affiliates have acquired the investor member interest in the Upper Tier Fund 3, but it is likely they have or they have a contractual right to do so.

## V.    The Relevant Provisions of the LPAs

102.    The LPAs are, as relevant to the dispute here, substantively identical.

103.    Section 4.2E of the LPAs contain what is commonly referred to as a "forced sale right," which ripens after the end of the Compliance Period and allows the Special Limited Partner to require, if the right is exercised, the General Partners to "use its best efforts to sell or refinance the Apartment Complex on terms acceptable to the Investor Limited Partner."  (LPAs §§ 4.2E.)

104.    Article 9 of the LPAs govern the distributions of cash generated by the Partnerships, including proceeds from (i) ordinary operations on an annual basis (*i.e.*, operational proceeds or cash flow), if any, and (ii) a sale or refinance of the Properties, often referred to as a "capital transaction."

105.    Operational proceeds, referred to as "Cash Flow" in the LPA, are not considered the same as capital transaction proceeds, which the LPA refers to as "Sale or Refinancing Transaction Proceeds."

106.    Article 9 of the LPAs contain two "waterfalls," which include a series of priority based cascading events pursuant to which the Partnerships must distribute, as the case may be, Cash Flow, if available, and Sale or Refinancing Transaction Proceeds, if available.

107.    Section 9.1 of the LPAs govern distributions of Cash Flow and contain the "Cash Flow Waterfall" – sometimes referred to in the LIHTC industry as the "Cash From Operations Waterfall."

108.    Section 9.1 of the LPAs governs the distribution of cash generated by the Partnerships' regular operations – i.e., the collection of rents from tenants, less the regular expenses of the Partnerships.

109.    Section 9.2 of the LPAs contain the "<u>Sales Proceeds Waterfall</u>," which governs the Partnerships' distribution of capital produced by a sale of the Properties, including the sales contemplated by the PSAs.

110.    Section 9.2 of the LPAs also governs the Partnerships' distribution of capital produced from a refinancing of the Partnerships' debt.

111.    The Section 9.1 and 9.2 waterfalls within the LPAs end with a carefully negotiated "split" amongst the partners, commonly referred to as an "economic sharing agreement," whereunder (i) the General Partners receive 90% of all net distributable cash from the Partnerships, regardless of whether from annual Cash Flow, a sale of the Properties, or a refinance of the Properties; and (ii) the Limited Partners collectively receive 10%.

112.    Section 9.2 is as follows:

**Section 9.2**    Distribution and Application of Sale or Refinancing Transaction Proceeds.

Subject to Section 13.4 hereof, Sale or Refinancing Transaction Proceeds shall be applied in the following order of priority:

(i)    To the payment of liabilities of the Partnership then due and owing to Persons other than the Partners;

(ii)    To establish such reserves as the General Partner, with the Consent of the Special Limited Partner, determines to be reasonably necessary for any contingent or foreseeable liability or obligation of the Partnership; *provided, however,* that the balance of any such reserve remaining at such time as the General Partner, with the Consent of the Special Limited Partner, shall determine that such reserve is no longer necessary shall be distributed in accordance with the following subparagraphs of this Section 9.2;

(iii)    To the Investor Limited Partner in an amount equal to any unpaid Tax Credit Shortfall Payments;

(iv)    To the Developer to the extent of any unpaid Deferred Development Fee;

(v)    To the Management Agent to the extent of any unpaid fees deferred pursuant to Section 8.1A;

(vi)    To pay the accrued interest, if any, and thereafter the principal, on any loans, including Voluntary Loans (but excluding Operating Loans and Deferred Development Fee), from Partners or their Affiliates provided for herein, pro rata in accordance with the amount of each such indebtedness as of the date of such distribution;

(vii)    To pay any unpaid Operating Loans;

(viii)    To the Investor Limited Partner until the Investor Limited Partner has received aggregate distributions pursuant to Section 9.1(i) and this Section 9.2(viii) equal to the Cumulative Priority Distribution;

(ix)    $10,000 to the Special Limited Partner; and

(x)    The balance, if any, 9.99% to the Investor Limited Partner, 0.01% to the Special Limited Partner and 90% to the General Partner.

113.    The LPAs define "Sale or Refinancing Transaction Proceeds" to mean "all cash receipts of the Partnership arising from a Sale or Refinancing Transaction…less" the expenses of

the Sale or Refinancing Transaction and payment of all debts and obligations of the Partnership due upon a Sale or Refinancing Transaction.

114.    A "Sale or Refinancing Transaction" means "a sale, transfer, exchange, or other disposition of all or substantially all of the assets of the Partnership…"  This includes the sale of the Properties to a third-party, which the PSAs contemplate will occur.

115.    Article 13 of the LPAs govern the "Dissolution and Termination" of the Partnerships, with Section 13.2 providing for liquidation upon dissolution.

116.    Section 13.4A. provides the "Liquidating Agent shall, to the extent feasible, liquidate the assets of the Partnership as promptly as shall be practicable.  To the extent the proceeds are sufficient <u>therefore</u>, as the Liquidating agent shall deem appropriate, the proceeds of such liquidation shall be applied in accordance with each of the numbered Paragraphs of Section 9.2 except for the last numbered Paragraph, and the balance of the assets of the Partnership shall be distributed by the Liquidating Agent, subject to Section 13.4E and in compliance with Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations, to the Partners with positive balances in their Capital Accounts…"  (emphasis in original)

117.    A sale of the Properties is an event that will lead to dissolution of the Partnerships and liquidation of its remaining assets as the Partnerships are being wound up following the sale and distribution of sale proceeds under Section 9.2.

118.    The sale of the Properties as contemplated by the PSAs will produce sale proceeds, which are not liquidation proceeds derived from activities undertaking by a Liquidating Agent.

119.    As of the date of the filing of this Complaint, neither of the Partnerships have a Liquidating Agent.

120.    As of the date of the filing of this Complaint, the Limited Partners have not requested the General Partners serve as a Liquidating Agent.

121.    As of the date of the filing of this Complaint, neither of the Partnerships have engaged in any liquidating activities.

122.    Section 3.7 provides that "No Partner shall have the right to demand a return of its Capital Contribution, except as otherwise provided in this Agreement."  (Landing LPA § 3.7)

## VI.    The Current Dispute

123.    The Compliance Period for both Partnerships ended on December 31, 2022.

124.    On or about January 25, 2023, after the General Partners had successfully caused all the Tax Credits to be delivered to the Investor Limited Partners by the Partnerships and which were no longer subject to recapture, Hunt caused the Special Limited Partner to exercise its forced sale right under Section 4.2.E of the LPAs.

125.    Consistent with its obligation, the General Partners marketed the Properties for sale.

126.    The Landing Partnership, with the express consent of the Defendants Special Limited Partner and CTCW-Robertsdale, entered into a PSA, effective July 25, 2023, for the sale of the Landing Property to a third-party for the purchase price of $2,750,000.00 ("Landing PSA"). A true and correct copy of the Landing PSA, as amended, is attached hereto as **Exhibit C.**

127.    On September 7, 2023, Dan Kagey, Hunt's Chief Financial Officer, executed a Notice of Intent to Transfer Investor Limited Partnership Interest on behalf of the Special Limited Partner and CTCW-Robertsdale for purposes of notifying the Alabama Housing Finance Authority of the impending sale of the Landing Property.  A true and correct copy of the Notice is attached hereto as **Exhibit D**.

128.    The Landing PSA is currently scheduled to close on October 10, 2023.

129.    The Bayou Bend Partnership, with the express consent of the Special Limited Partner and CTCW-Bayou, entered into a Purchase and Sale Agreement with the Effective Date of July 24, 2023, for the sale of the Bayou Bend Property to a third-party for the purchase price of $1,050,000.00 ("Bayou Bend PSA").   A true and correct copy of the Bayou Bend PSA, as amended, is attached hereto as **Exhibit E.**

130.    On September 7, 2023, Dan Kagey also executed a Notice of Intent to Transfer Investor Limited Partnership Interest on behalf of the Special Limited Partner and CTCW-Bayou for purposes of notifying the Alabama Housing Finance Authority of the impending sale of the Bayou Bend Property.  A true and correct copy of the Notice is attached hereto as **Exhibit F**.

131.    On July 11, 2023, Hunt caused its counsel, and counsel for the Limited Partners, to prepare and send separate draft "Written Consent[s] of the Special Limited Partner" of the Partnerships (the "Draft Consents").  A true and correct copy of the Draft Consents are attached hereto as **Exhibit G** and **Exhibit H**.

132.    The Draft Consents contained provisions suggesting that the purchase price from the PSAs would be disbursed according to a waterfall analysis allegedly prepared in accordance with the LPAs, but included a waterfall illustration that did not depict the sale proceeds being distributed in accordance with Section 9.2 of the LPAs.  Instead, what was provided was a waterfall schedule depicting the sale proceeds from the PSAs, along with other Partnership assets, being treated and disbursed as if they were liquidation proceeds under Section 13.4 of the LPAs.

133.    The methodology in the waterfall attached to the Draft Consents does not depict the distribution of sale proceeds from the sale of the Properties under the PSAs pursuant to Section 9.2 of the LPA.

134.    Specifically, the methodology provided by Defendants' counsel (i) illustrated a liquidation of the Partnerships such that the proceeds from the sale of the Properties, along with other assets of the Partnerships which are not part of the sales, including the Partnerships' reserve accounts, would be distributed to the Investor Limited Partners in accordance with their respective positive capital account balances; but (ii) did not illustrate a distribution of the proceeds from the sale of the Properties as required by the Sale Proceeds Waterfall in Section 9.2 of the LPAs in accordance with the 90/10% sharing of residual or net sale proceeds in favor of the General Partners.

135.    Counsel for the General Partners notified the Limited Partners' counsel that there was "a disconnect" with the waterfall provided by the Limited Partners in connection with the Draft Consents.

136.    The General Partners subsequently provided, by counsel through a September 21, 2023 email, the Limited Partners with a waterfall analysis prepared by an accountant that (i) utilized the sale price from the Landing PSA, and (ii) disbursed the sale proceeds according to Section 9.2 of the Landing LPA.  A true and correct copy of such is attached hereto as **Exhibit I**. This methodology controls the distribution of sale proceeds to be received by the Partnerships from the PSAs.

137.    On September 7, 2023, the Limited Partners' counsel emailed the General Partners' counsel and asserted that because "Section 9.2 of the current LPAs expressly states that it is 'Subject to Section 13.4,'" that Section 13.4 governs the distribution of sale proceeds from the sale of the Properties.

138.    The General Partners disagree and contend that the distribution of sale proceeds must be made pursuant to the Sales Proceeds Waterfall found in Section 9.2 of the LPAs, and that

Section 13.4 of the LPAs does not apply to disrupt the distribution of proceeds from the sales contemplated by the PSAs.

139.    At least six different courts from other jurisdictions, including appellate courts, have confirmed in similar disputes that the General Partners' contentions here in this case are correct. *See generally Hopkins Court*, 195 A.D.3d 1375; *St. Mary's*, 2022 WL 3699484; *Berkshire I*, 2020 WL 1856259 at *3-4; *Berkshire II* (describing Aggregator trend and playbook); *Waterford I*, 2022 WL 1717946 at *10-11.

140.    On September 27, 2023, the Limited Partners' counsel provided the General Partners' counsel with a draft Escrow Agreement, which contemplated that proceeds from the sale of the Properties pursuant to the PSAs would be held in an Escrow Account under the control of an Escrow Agent following the sales and until resolution of the dispute described herein.

141.    On September 28, 2023, the General Partners' counsel provided the Limited Partners' counsel with revisions to the Draft Consents.

142.    On October 3, 2023, the General Partners' counsel provided the Limited Partners' counsel with revisions to the draft Escrow Agreement, which (among other things): (a) confirmed the sale of the Properties pursuant to the PSAs could continue for closing as anticipated; (b) the parties would preserve all rights and claims associated with the sale of the Properties, sales proceeds, and their disagreements described herein; and (c) the Partnership would deposit residual sale proceeds into a segregated account opened for purposes of holding such proceeds, rather than holding them in an Escrow Account with an Escrow Agent, until the dispute described herein is resolved.

143.    The parties have been unable to come to agreement on the Draft Consents or an agreement pursuant to which sale proceeds would be held but continue to agree that the Properties

may be sold pursuant to the PSAs, which the Limited Partners have consented to despite the parties being unable to come to an agreement on the Draft Consents or where to hold sale proceeds until the disputes described herein are resolved.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT
### ALA. CODE § 6-6-220 TO § 6-6-232

144.    The General Partners fully incorporate the above paragraphs by reference as if fully stated herein.

145.    Under the Alabama Declaratory Judgment Act, codified at Ala. Code §§ 6-6-220 through – 232, parties to a contract may seek a declaration of rights, status, or other legal relations under a contract.

146.    Section 6-6-223 provides that "Any person interested under a … written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a … contract … may have determined any question of construction or validity arising under the … contract … and obtain a declaration of rights, status, or other legal relations thereunder."

147.    As described above, a definite and concrete controversy exists between the General Partners, on the one hand, and the Special Limited Partner and the Investor Limited Partners, on the other hand, as to the proper distribution of the proceeds from the sale of the Properties under the LPAs.

148.    The LPAs are valid and binding written contracts.

149.    The General Partners are entitled to a declaration under the Alabama Declaratory Judgment Act that:

      a.    Section 9.2 of the LPAs govern the distribution of sale proceeds from the sales of the Properties, including under the PSAs;

      b.      The liquidation and dissolution provisions of the LPAs, including Section 13.4, do not control or alter the distribution of sale proceeds from the sales of the Properties, including from the sale proceeds to be received by the Partnerships pursuant to the PSAs;

      c.      The sales of the Properties and distribution of sale proceeds therefrom are separate and distinct from the subsequent dissolution and liquidation of the Partnerships, whereby sale proceeds are first distributed pursuant to Section 9.2 of the LPAs when the Properties are sold and the Partnerships' remaining assets are subsequently distributed later, pursuant to Section 13.4 of the LPAs, when the Partnerships are subsequently wound up and dissolved in the year following the sale; and

      d.      Sale proceeds are not distributed as liquidation proceeds.

150. The General Partners further pray for all further relief to which they may be entitled pursuant to the foregoing declarations, including an order that authorizes the General Partners to cause the Partnerships, or any other applicable party in possession of the sales proceeds, to distribute the sale proceeds from the sales of the Properties to the General Partners pursuant to Section 9.2 of the LPAs.

151. The General Partners further pray for an award of their costs, expenses, and reasonable attorneys' fees incurred incident to this proceeding pursuant to Section 15.14 of the LPAs.

152. The General Partners further pray for an award of all allowable costs that are equitable and just pursuant to Ala. Code § 6-6-231.

## **PRAYER FOR RELIEF**

WHEREFORE, the General Partners pray for relief as follows:

1. A declaration under the Alabama Declaratory Judgment Act that:

      a.      Section 9.2 of the LPAs govern the distribution of sale proceeds from the sales of the Properties, including under the PSAs;

      b.      The liquidation and dissolution provisions of the LPAs, including Section 13.4, do not control or alter the distribution of sale proceeds from the sales

of the Properties, including from the sale proceeds to be received by the Partnerships pursuant to the PSAs;

c.      The sales of the Properties and distribution of sale proceeds therefrom are separate and distinct from the subsequent dissolution and liquidation of the Partnerships, whereby sale proceeds are first distributed pursuant to Section 9.2 of the LPAs when the Properties are sold and the Partnerships' remaining assets are subsequently distributed later, pursuant to Section 13.4 of the LPAs, when the Partnerships are subsequently wound up and dissolved in the year following the sale; and

d.      Sale proceeds are not distributed as liquidation proceeds.

2.      All further relief to which they may be entitled pursuant to the foregoing declarations, including an order that authorizes the General Partners to cause the Partnerships, or any other applicable party in possession of the sales proceeds, to distribute the sale proceeds from the sales of the Properties to the General Partners pursuant to Section 9.2 of the LPAs.

3.      An award of their costs, expenses, and reasonable attorneys' fees incurred incident to this proceeding pursuant to Section 15.14 of the LPAs.

4.      An award of all allowable costs that are equitable and just pursuant to Ala. Code § 6-6-231.

5.      That the Court order such other and further relief, including, without limitation, monetary relief and attorneys' fees and costs, which the Court may deem just, equitable and appropriate under the circumstances presented.

### DEMAND FOR JURY TRIAL

The General Partners demand a jury trial on all issues so triable.

Dated: October 4, 2023

Respectfully submitted,

Dennis R. Bailey
J. Evans Bailey
**Rushton, Stakely, Johnston & Garrett**
PO Box 270
Montgomery, AL 36101
T: (334) 206-3100
DRB@rushtonstakely.com
ebailey@rushtonstakely.com

and

David A. Davenport
*(pro hac vice application forthcoming)*
Justin H. Jenkins
*(pro hac vice application forthcoming)*
**BC Davenport, LLC**
105 5ᵗʰ Avenue South, Suite 375
Minneapolis, MN 55401
T: (612) 445-8010
david@bcdavenport.com
justin@bcdavenport.com

*Attorneys for Plaintiffs*

20911447v4