IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

THE LANDING, L.L.C., *et al.*,        *
                                      *
    Plaintiffs,               *
                                      *
vs.                                   *   CIVIL ACTION NO. 23-00377-TFM-B
                                      *
MG AFFORDABLE MASTER, LLC,            *
*et al.*,                             *
                                      *
    Defendants.               *

## REPORT AND RECOMMENDATION

This action is before the Court on the parties' cross-motions for judgment on the pleadings (Doc. 32, 43).[1] Upon consideration of all matters presented, the undersigned recommends, for the reasons stated herein, that Plaintiffs' motion for judgment on the pleadings (Doc. 43) be **GRANTED,** and that Defendants' motion for judgment on the pleadings (Doc. 32) be **DENIED.**

## I.  LEGAL STANDARDS

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." Hawthorne v. Mac Adjustment, Inc., 140

---

[1] The motions were referred to the undersigned Magistrate Judge for consideration and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(S).

F.3d 1367, 1370 (11th Cir. 1998). In determining whether a party is entitled to judgment on the pleadings, courts "accept as true all material facts alleged in the non-moving party's pleading" and "view those facts in the light most favorable to the non-moving party." <u>Perez v. Wells Fargo N.A.</u>, 774 F.3d 1329, 1335 (11th Cir. 2014). "If a comparison of the averments in the competing pleadings reveals a material dispute of fact, judgment on the pleadings must be denied." <u>Id.</u>

Generally speaking, courts "will not consider matters outside the pleadings when passing on a Rule 12(c) motion." <u>Horsley v. Feldt</u>, 304 F.3d 1125, 1136 n.6 (11th Cir. 2002). An exception is that courts "may also consider documents attached to the plaintiff's complaint if they are (1) central to the plaintiff's claim and (2) undisputed." <u>Bank of Camilla v. St. Paul Mercury Ins. Co.</u>, 531 F. App'x 993, 994 (11th Cir. 2013) (per curiam).

## II. <u>FACTS</u>

Plaintiffs The Landing, L.L.C. ("Landing GP") and Bayou Bend, L.L.C. ("Bayou Bend GP") filed an amended complaint against Defendants MG Affordable Master, LLC ("MG Affordable Master"), CTCW-Robertsdale, LLC ("CTCW-Robertsdale"), and CTCW-Bayou La Batre LLC ("CTCW-Bayou"). Plaintiffs seek a declaration of the rights and obligations of the partners to two Low-Income Housing Tax Credit partnerships under their respective partnership agreements. (Doc. 21). The parties agree, and the pleadings

establish, that the Court has diversity subject matter jurisdiction over this action.[2]

For ease of reference, the Court will collectively refer to Plaintiffs as the "General Partners" and to Defendants as the "Limited Partners." In addition, the Court will refer to Defendant CTCW-Robertsdale together with Defendant CTCW-Bayou as the "Investor Limited Partners."

**The LIHTC Program**

This dispute involves apartment complexes that were developed pursuant to the Low-Income Housing Tax Credit ("LIHTC") program, codified at 26 U.S.C. § 42 of the Internal Revenue Code. The LIHTC program is "designed to promote the development of affordable rental housing for low-income households." Senior Hous. Assistance Grp. v. AMTAX Holdings 260, LLC, 2019 U.S. Dist. LEXIS 26165, at *3, 2019 WL 687837, at *1 (W.D. Wash. Feb. 19, 2019). "The LIHTC program gives investors a monetary incentive to invest in low income housing by providing tax credits rather than traditional cash returns." In re Sunnyslope Hous. Ltd. P'ship,

---

[2] According to the pleadings, the sole member of both Landing GP and Bayou Bend GP is a citizen of Alabama. (Doc. 21 at 4-5; Doc. 31 at 5). MG Affordable Master is owned by members all of which are citizens of Delaware and Texas. (Doc. 37 at 1-2). CTCW-Robertsdale's members are citizens of Delaware, Texas, California, and Florida. (Doc. 38 at 1-3). CTCW-Bayou's members are citizens of Delaware and Texas. (Doc. 39 at 1-3). The values of the assets that are the subject of this declaratory action well exceed $75,000. (See Doc. 21 at 43-44; Doc. 31 at 30, 32-34). Therefore, this Court has diversity jurisdiction over this action.

818 F.3d 937, 941 (9th Cir. 2016). "LIHTC projects have a fifteen-year 'Compliance Period,' after which 'most investor limited partners will seek to leave the project[.]'" JAE Props., Inc. v. AMTAX Holdings 2001-XX, LLC, --- F. Supp. 3d ----, 2024 U.S. Dist. LEXIS 23705, at *3, 2024 WL 538570, at *1 (S.D. Cal. Feb. 9, 2024) (citations omitted).

"In typical LIHTC projects, the developer sells the tax credit allocation to an outside investor." Wesley Hous. Dev. Corp. of N. Va. v. SunAmerica Hous. Fund 1171, 577 F. Supp. 3d 448, 453 (E.D. Va. 2021) (citing Mark K. Keightley, Cong. Rsch. Serv., RS22389, An Introduction to the Low-Income Housing Tax Credit (2021)). "The sale of the LIHTC credits is facilitated through a limited partnership between the developer and the outside investor, in which the developer holds a *de minimus* ownership percentage but operates as the general partner responsible for the building and day-to-day operations of the housing development." Id. In such an arrangement, "[t]he investor limited partners contribute capital and, in return, are allocated the tax benefits flowing from the project, including the LIHTC tax credits, deductions for depreciation, and other tax losses." Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC, 431 F. Supp. 3d 995, 997 (N.D. Ill. 2020) (quoting Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P., 99 N.E.3d 744, 749 (Mass. 2018)). At the end of the fifteen-year compliance period, when all tax credits have been

claimed and are no longer subject to recapture, most investor limited partners will seek to leave the project. <u>Senior Hous. Assistance Grp.</u>, 2019 U.S. Dist. LEXIS 26165, at *3-4, 2019 WL 687837, at *1.

**The Landing**

Apartment Housing of Robertsdale, Ltd. (the "Landing Partnership") was formed in 2006 for the purpose of developing, owning, and operating a 60-unit affordable housing apartment complex in Robertsdale, Alabama (the "Landing Property"). (Doc. 21 at 2; Doc. 21-1 at 9, 27; Doc. 32 at 4). The Landing Partnership is governed by an Amended and Restated Agreement of Limited Partnership, dated as of December 1, 2006 (the "Landing LPA"). (Doc. 21 at 2; Doc. 31 at 2). At the time of this dispute, Landing GP was the Landing Partnership's general partner, MG Affordable Master was its special limited partner, and CTCW-Robertsdale was its investor limited partner. (<u>Id.</u>). Hunt Capital Partners, LLC ("Hunt") is the authorized representative of MG Affordable Master and CTCW-Robertsdale.[3] (Doc. 31 at 3; Doc. 43 at 12).

---

[3] The General Partners accuse Hunt of being an "Aggregator" – an entity that acquires limited partner interests in LIHTC partnerships and then attempts "'to extract value out of [limited partner] interests that were not intended by the original parties to the partnerships' by, *inter alia*, 'challeng[ing] the contractual transfer rights associated with those partnerships.'" (Doc. 21 at 20-21 (citations omitted)).

In 2023, CTCW-Robertsdale exercised its right under the Landing LPA to request that Landing GP use its best efforts to sell the Landing Property on terms acceptable to CTCW-Robertsdale. (Doc. 21 at 32; Doc. 21-1 at 38; Doc. 31 at 3-4). Thus, Landing GP caused the Landing Partnership to market the Landing Property for sale, which resulted in the Landing Partnership's sale of the Landing Property for $2,750,000.00 to a third party on October 10, 2023. (Doc. 21 at 32, 36; Doc. 21-11 at 2; Doc. 31 at 4). After paying off certain debts and expenses, the Landing Partnership was left with $2,481,026.97 in net proceeds from the sale of the Landing Property. (Doc. 21 at 37; Doc. 21-11 at 3; Doc. 31 at 30). Because the partners could not agree on how the proceeds from the sale of the Landing Property should be distributed, the $2,481,026.97 in net sale proceeds were deposited into a segregated account and have since been deposited into this Court's registry pending further order of the Court. (Doc. 18 at 3; Doc. 21 at 38; Doc. 31 at 30).

**Bayou Bend**

Apartment Housing of Bayou La Batre, Ltd. (the "Bayou Bend Partnership", and together with the Landing Partnership, the "Partnerships") was formed in 2006 for the purpose of developing, owning, and operating a 55-unit affordable housing apartment complex in Bayou La Batre, Alabama (the "Bayou Bend Property", and together with the Landing Property, the "Properties"). (Doc. 21

at 2; Doc. 21-2 at 9, 26-27; Doc. 32 at 6-7). The Bayou Bend Partnership is governed by an Amended and Restated Agreement of Limited Partnership, dated as of December 19, 2006 (the "Bayou Bend LPA"). (Doc. 21 at 2; Doc. 31 at 3). At the time of this dispute, Bayou Bend GP was the Bayou Bend Partnership's general partner, MG Affordable Master was its special limited partner, and CTCW-Bayou was its investor limited partner. (Id.). Hunt is the authorized representative of MG Affordable Master and CTCW-Bayou. (Doc. 31 at 3). The Bayou Bend LPA and the Landing LPA (collectively, the "LPAs") are substantively identical to one another. (Doc. 21 at 26; Doc. 31 at 18).

In 2023, CTCW-Bayou exercised its right under the Bayou Bend LPA to request that Bayou Bend GP use its best efforts to sell the Bayou Bend Property on terms acceptable to CTCW-Bayou. (Doc. 21 at 32; Doc. 21-2 at 38; Doc. 31 at 3-4). Thus, Bayou Bend GP caused the Bayou Bend Partnership to market the Bayou Bend Property for sale, which resulted in the Bayou Bend Partnership's sale of the Bayou Bend Property for $1,050,000.00 to a third party on October 23, 2023. (Doc. 21 at 33, 39; Doc. 21-14 at 2; Doc. 31 at 4). After paying off certain debts and expenses, the Bayou Bend Partnership was left with $890,168.79 in proceeds from the sale of the Bayou Bend Property. (Doc. 21 at 39-40; Doc. 31 at 33-34). Because the partners could not agree on how the proceeds from the sale of the Bayou Bend Property should be distributed, the proceeds

were deposited into a segregated account, and $890,168.79 in proceeds from the sale of the Bayou Bend Property have since been deposited into this Court's registry pending further order of the Court. (Doc. 21 at 41; Doc. 22 at 3; Doc. 30 at 1; Doc. 31 at 34).

### III. <u>DISCUSSION</u>

The General Partners seek a declaration that they are entitled under the LPAs to receive the majority of the proceeds from the sales of the Properties. (Doc. 21 at 42-46). Specifically, the General Partners contend that the proceeds from the sales of the Properties "are 'Sale or Refinancing Transaction Proceeds' that must be distributed in accordance with Section 9.2 of the LPAs such that they are distributed approximately 90% to the General Partners and 10% to the Limited Partners." (Doc. 43 at 14).

In contrast, the Limited Partners argue that the proceeds from the sales of the Properties must be treated as liquidation proceeds and distributed pursuant to Section 13.4 of the LPAs "to the partners with positive balances in their Capital Accounts, in accordance with the ratio of such positive Capital Account balances," such that the Limited Partners "are entitled to the bulk of the sales proceeds." (Doc. 32 at 11-13).

**Relevant Provisions of the LPAs**

Under Section 4.2.E(i) of the LPAs, the Investor Limited Partners had the right, "at any time after the Compliance Period,"[4] to request that the General Partners use their "best efforts to sell or refinance the [Properties] on terms acceptable to the Investor Limited Partner." (Doc. 21-1 at 38; Doc. 21-2 at 38). Alternatively, Section 4.2.E(ii) granted the General Partners the option, after the end of the Compliance Period, to purchase either the Limited Partners' interests in the Partnerships or the Properties for fair market value. (Doc. 21-1 at 39; Doc. 21-2 at 39).

Article 9 of the LPAs contains two "waterfall" provisions outlining a series of priority-based payments ending with a distribution to the partners.[5] (Doc. 21-1 at 63-64; Doc. 21-2 at 62-64). First, Section 9.1 contains a "Distribution and Application of Cash Flow" waterfall, which the parties all agree

---

[4] "The owners of LIHTC properties . . . can claim tax credits offsetting various liabilities over a ten-year period, but must comply with [26 U.S.C. §] 42's affordability restrictions for a period of 15 years (the 'Compliance Period') to avoid recapture of those credits." Saugatuck, LLC v. St. Mary's Commons Assocs., L.L.C., 2022 U.S. Dist. LEXIS 155657, at *5 n.2, 2022 WL 3699484, at *2 n.2 (E.D.N.Y. Aug. 26, 2022).

[5] See Bank of New York Tr. Co. v. Franklin Advisers, Inc., 726 F.3d 269, 274 (2d Cir. 2013) (noting that sets of detailed payment priorities were "called 'Waterfalls' because the payments cascade downward to a pool at the bottom for distribution to the shareholders").

does not apply to the proceeds from the sales of the Properties. (Doc. 21-1 at 63; Doc. 21-2 at 62-63). Second, Section 9.2 contains a "Distribution and Application of Sale or Refinancing Transaction Proceeds" waterfall, which provides as follows:

**Section 9.2** <u>Distribution and Application of Sale or Refinancing Transaction Proceeds.</u>

***Subject to Section 13.4 hereof***, **Sale or Refinancing Transaction Proceeds shall be applied in the following order of priority:**

(i) To the payment of liabilities of the Partnership then due and owing to Persons other than the Partners;

(ii) To establish such reserves as the General Partner, with the Consent of the Special Limited Partner, determines to be reasonably necessary for any contingent or foreseeable liability or obligation of the Partnership; *provided, however,* that the balance of any such reserve remaining at such time as the General Partner, with the Consent of the Special Limited Partner, shall determine that such reserve is no longer necessary shall be distributed in accordance with the following subparagraphs of this Section 9.2;

(iii) To the Investor Limited Partner in an amount equal to any unpaid Tax Credit Shortfall Payments;

(iv) To the Developer to the extent of any unpaid Deferred Development Fee;

(v) To the Management Agent to the extent of any unpaid fees deferred pursuant to Section 8.1A;

(vi) To pay the accrued interest, if any, and thereafter the principal, on any loans, including Voluntary Loans (but excluding Operating Loans and Deferred Development Fee), from Partners or their Affiliates provided for herein, pro rata in accordance with the amount of each such indebtedness as of the date of such distribution;

(vii) To pay any unpaid Operating Loans;

(viii) To the Investor Limited Partner until the Investor Limited Partner has received aggregate distributions pursuant to Section 9.1(i) and this Section 9.2(viii) equal to the Cumulative Priority Distribution;

(ix) $10,000 to the Special Limited Partner; and

**(x) The balance, if any, 9.99% to the Investor Limited Partner, 0.01% to the Special Limited Partner and 90% to the General Partner.**

(Doc. 21-1 at 63-64; Doc. 21-2 at 63-64 (emphasis added)).

The LPAs define "Sale or Refinancing Transaction Proceeds" as "all cash receipts of the Partnership arising from a Sale or Refinancing Transaction . . . less the following: (i) the amount of cash paid or to be paid in connection with or as an expense of such Sale or Refinancing Transaction, . . . and (ii) the amount necessary for the payment of all debts and obligations of the Partnership due upon the occurrence of the particular Sale or Refinancing Transaction."  (Doc. 21-1 at 24-25; Doc. 21-2 at 24). A "Sale or Refinancing Transaction" is defined to include "a sale . . . of all or substantially all of the assets of the Partnership." (Doc. 21-1 at 24; Doc. 21-2 at 24).

Article 13 governs the "Dissolution and Termination" of the Partnerships.  (Doc. 21-1 at 77; Doc. 21-2 at 77).  Section 13.1 states that the "the Partnership shall be dissolved . . . upon the happening of any of the following events: . . . (iv) [t]he sale or other disposition of all or substantially all of the assets of the Partnership."  (Id.).

11

Section 13.2 provides:

**Upon the dissolution of the Partnership, the Partnership shall be liquidated in accordance with this Article 13 and the Uniform Act.** The liquidation shall be conducted and supervised by the General Partner or, if there is no remaining General Partner, by the Special Limited Partner (the General Partner or Special Limited Partner, as the case may be, being hereinafter referred to as the "Liquidating Agent"). The Liquidating Agent shall have all of the rights in connection with the liquidation and termination of the Partnership that a general partner would have with respect to the assets and liabilities of the Partnership during the term of the Partnership, and the Liquidating Agent is hereby expressly authorized and empowered to effectuate the liquidation and termination of the Partnership and the transfer of any assets and liabilities of the Partnership. The Liquidating Agent shall have the right from time to time, by revocable powers of attorney, to delegate to one or more persons any or all of such rights and powers and the authority and power to execute documents in connection therewith, and to fix the reasonable compensation of each such person, which compensation shall be charged as an expense of liquidation. The Liquidating Agent is also expressly authorized to distribute the Partnership's property to the Partners subject to liens.

(Doc. 21-1 at 78; Doc. 21-2 at 78 (bold added)). Section 13.4

provides, in pertinent part:

**Section 13.4** Priority on Liquidation; Distribution of Non-Liquid Assets.

A. General. **The Liquidating Agent shall, to the extent feasible, liquidate the assets of the Partnership as promptly as shall be practicable.** To the extent the proceeds are sufficient therefore, as the Liquidating Agent shall deem appropriate, **the proceeds of such liquidation shall be applied in accordance with each of the numbered Paragraphs of Section 9.2 except for the last numbered Paragraph, and the balance of the assets of the Partnership shall be distributed** by the Liquidating Agent, subject to Section 13.4E and in compliance with Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations, **to the Partners with positive balances in**

12

**their Capital Accounts, in accordance with the ratio of such positive Capital Account balances,** after giving effect to all contributions, distributions, allocations and adjustments required hereunder, for all periods, in the order of priority established pursuant to Section 10.2 hereof.

(<u>Id.</u> (bold added)).  Section 13.5, titled "Orderly Liquidation," provides that "[a] reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities so as to minimize the losses normally attendant upon a liquidation."  (Doc. 21-1 at 80; Doc. 21-2 at 80).

**The Parties' Arguments**

The General Partners argue:

> The plain and unambiguous language of the LPAs state that "Sale or Refinancing Transaction Proceeds" – which are expressly defined to include the net proceeds generated from "a sale of all or substantially all of the assets of the Partnership[s,]" (LPAs, Art. I) – shall be distributed pursuant to Section 9.2.  Specifically, Section 9.2 provides: "Subject to Section 13.4, Sale or Refinancing Transaction Proceeds shall be applied in the following order of priority: . . ." (<u>Id.</u> § 9.2 (emphasis added)).  Thus, Section 9.2 governs the distribution of Sale Proceeds from the sale of the Properties under the PSAs, which results in the General Partners receiving 90% and the Limited Partners receiving 10% of such proceeds in the last tier of the waterfall (Section 9.2(x)).

(Doc. 43 at 27).

The Limited Partners take a contrary position:

> [P]ursuant to Section 13.1, "[t]he Partnership **shall be dissolved** prior thereto upon the happening of . . . the sale or other disposition of all or substantially all of the assets of the Partnership." (Doc. 21-1 at § 13.1(iv); Doc. 21-2 at § 13.1(iv) (emphasis added).)

13

Section 13.2 goes on to specify that upon dissolution, each Partnership shall be liquidated and sets out what happens in the event of a liquidation:

> **Upon the dissolution of the Partnership, the Partnership shall be liquidated** in accordance with this Article 13 and the Uniform Act. The liquidation shall be conducted and supervised by the General Partner or, if there is no remaining General Partner, by the Special Limited Partner (the General Partner or Special Limited Partner, as the case may be, being hereinafter referred to as the "Liquidating Agent"). The Liquidating Agent shall have all of the rights in connection with the liquidation and termination of the Partnership that a general partner would have with respect to the assets and liabilities of the Partnership during the term of the Partnership, and **the Liquidating Agent is hereby expressly authorized and empowered to effectuate the liquidation and termination of the Partnership and the transfer of any assets and liabilities of the Partnership**. The Liquidating Agent shall have the right from time to time, by revocable powers of attorney, to delegate to one or more persons any or all of such rights and powers and the authority and power to execute documents in connection therewith, and to fix the reasonable compensation of each such person, which compensation shall be charged as an expense of liquidation. The Liquidating Agent is also expressly authorized to distribute the Partnership's property to the Partners subject to liens.

(Doc. 21-1 at § 13.2; Doc. 22-2 at § 13.2 (emphasis added).) The Liquidating Agent "shall, to the extent feasible, liquidate the assets of the Partnership as promptly as shall be practicable" and shall distribute the proceeds of the liquidation in accordance with Section 13.4. (Doc. 21-1 at § 13.4; Doc. 21-2 at § 13.4.)

Section 13.4, in turn, dictates how the proceeds are to be distributed:

To the extent the proceeds are sufficient therefore, as the Liquidating Agent shall deem appropriate, **the proceeds of such liquidation shall be applied in accordance with each of the numbered Paragraphs of Section 9.2 except for the last numbered Paragraph**, and **the balance of the assets of the Partnership shall be distributed** by the Liquidating Agent, subject to Section 13.4E and in compliance with Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations, **to the Partners with positive balances in their Capital Accounts, in accordance with the ratio of such positive Capital Account balances**, after giving effect to all contributions, distributions, allocations and adjustments required hereunder, for all periods, in the order of priority established pursuant to Section 10.2 hereof.

(Doc. 21-1 at § 13.4A; Doc. 21-2 at § 13.4A (emphasis added).)

In other words, in liquidation, the Liquidating Agent must distribute the proceeds of the dissolved and terminated Partnership (which occurs upon the sale of all or substantially all the Partnerships' assets, like here when the Projects were sold) under Section 9.2's waterfall provisions *except for* the last provision of that waterfall provision. So, instead of distributing 9.99% of the balance of the proceeds to the Investor Limited Partner, 0.01% to the Special Limited Partner, and 90% to the General Partner (the Plaintiffs), as the last numbered paragraph of Section 9.2 provides, the Liquidating Agent must distribute the proceeds "to the Partners with positive balances in their Capital Accounts, in accordance with the ratio of such positive Capital Account balances." When that is done, Defendants are entitled to the bulk of the sales proceeds.

In sum, pursuant to the plain terms of the Partnership Agreements, the sales of the Projects are liquidation events that cause the dissolution and termination of the Partnerships and obligate Plaintiffs to provide an accounting of each Partnership's accounts (§ 13.3), wind up their affairs (§§ 13.3-13.4), and

distribute all remaining proceeds in accordance with
        Sections 13.4.

(Doc. 32 at 11-13 (emphasis in original)).

**Rules of Contract Interpretation**

The parties agree that the LPAs must "be construed and enforced in accordance with the laws of the State of Alabama." (Doc. 21 at 6; Doc. 31 at 6; Doc. 32 at 9; Doc. 43 at 16 n.3; <u>see</u> Doc. 21-1 at 83; Doc. 21-2 at 83).

        Under general Alabama rules of contract interpretation,
        the intent of the contracting parties is discerned from
        the whole of the contract. Where there is no indication
        that the terms of the contract are used in a special or
        technical sense, they will be given their ordinary,
        plain, and natural meaning. If the court determines
        that the terms are unambiguous (susceptible of only one
        reasonable meaning), then the court will presume that
        the parties intended what they stated and will enforce
        the contract as written. On the other hand, if the court
        determines that the terms are ambiguous (susceptible of
        more than one reasonable meaning), then the court must
        use established rules of contract construction to
        resolve the ambiguity. Under those established rules of
        contract construction, where there is a choice between
        a valid construction and an invalid construction the
        court has a duty to accept the construction that will
        uphold, rather than destroy, the contract and that will
        give effect and meaning to all of its terms.

<u>Once Upon a Time, LLC v. Chappelle Properties, LLC</u>, 209 So. 3d 1094, 1097 (Ala. 2016) (internal citations and quotation marks omitted). "It is a court's duty to "use 'all efforts to reconcile' contractual provisions.'" <u>Hall Hous. Invs., Inc. v. 1997 Fund XV Series E, Ltd.</u>, 2022 U.S. Dist. LEXIS 148869, at *8, 2022 WL 3580755, at *3 (M.D. Ala. Aug. 19, 2022) (quoting <u>Vesta Fire Ins.</u>

Corp. v. Liberty Nat'l Life Ins. Co., 893 So. 2d 395, 405 (Ala. Civ. App. 2003)).

**Analysis**

The undersigned observes as a preliminary matter that the contract provisions at issue are not the model of clarity because, standing alone, one provision supports the General Partners' position, while another provision supports the Limited Partners' position. Notwithstanding, both sides agree that the contract provisions governing their dispute are plain and unambiguous, and that this controversy should be resolved by examining the four corners of the LPAs. (Doc. 32 at 11; Doc. 43 at 27). Indeed, as noted *supra,* it is this Court's duty to use all efforts to reconcile contractual provisions. Based upon the totality of the contractual provisions, the undersigned finds that in order to give effect to the contractual provisions, the proceeds from the sales of the Properties must be distributed under Section 9.2 of the LPAs.

As outlined above, Section 9.2 provides: "Subject to Section 13.4 hereof, **Sale or Refinancing Transaction Proceeds shall be applied in the following order of priority: . . . .**" (Doc. 21-1 at 63; Doc. 21-2 at 63 (bold added)). "Sale or Refinancing Transaction Proceeds" are "all cash receipts of the Partnership arising from a Sale or Refinancing Transaction" minus the expenses of such a transaction and any debt that must be paid upon the

occurrence of such a transaction (e.g., a mortgage). (Doc. 21-1 at 24-25; Doc. 21-2 at 24). A "Sale or Refinancing Transaction" includes "a sale . . . of all or substantially all of the assets of the Partnership." (Doc. 21-1 at 24; Doc. 21-2 at 24). There is no dispute that the sales of the Properties to third parties were "a sale . . . of all or substantially all of the assets of the Partnership[s]." (Doc. 21 at 29; Doc. 32 at 12; Doc. 43 at 26).

Section 13.1 of the LPAs provides that the Partnerships "shall be dissolved . . . upon the happening of any of the following events: . . . (iv) [t]he sale or other disposition of all or substantially all of the assets of the Partnership." (Doc. 21-1 at 77; Doc. 21-2 at 77). Section 13.2 states that "[u]pon the dissolution of the Partnership, the Partnership shall be liquidated in accordance with this Article 13 and the Uniform Act." (Doc. 21-1 at 78; Doc. 21-2 at 78). And Section 13.4 provides that "the proceeds of such liquidation shall be applied in accordance with each of the numbered Paragraphs of Section 9.2 except for the last numbered Paragraph, and the balance of the assets of the Partnership shall be distributed . . . to the Partners with positive balances in their Capital Accounts, in accordance with the ratio of such positive Capital Account balances . . . ." (Id.).

The Limited Partners posit that (a) because Section 9.2 states that it is "[s]ubject to Section 13.4 hereof," and (b) because Section 13.1 provides that "the Partnership shall be dissolved . . . upon the . . . sale or other disposition of all or substantially all of the assets of the Partnership," then the proceeds from the sales of the Properties must be treated as "proceeds of . . . liquidation," combined with the Partnerships' remaining assets, and then distributed to the partners in accordance with the ratio of their positive capital account balances under Section 13.4 of the LPAs. Thus, the Limited Partners take the position that the sales of the Properties and the dissolution and liquidation of the Partnerships are all part of the same process rather than separate and distinct events.

The Court rejects this reading of the LPAs because it would render portions of Section 9.2 meaningless. While there is no question that the sales of the Properties *trigger* the dissolution and liquidation of the Partnerships, the LPAs make a clear distinction between these events and recognize that sales can occur under two different scenarios – one separate and apart from a dissolution, and one occurring as part of the liquidation process connected with a dissolution. Consequently, the sales of the Properties and the distribution of proceeds from the sales "are distinct and separate from a subsequent dissolution and liquidation of the Partnership." AMTAX Holdings 436, LLC v. Full

Circle Villagebrook GP, LLC, 2024 U.S. Dist. LEXIS 107882, at *14, 2024 WL 3043171, at *5 (N.D. Ill. June 18, 2024); see also Centerline/Fleet Hous. P'ship, L.P. - Series B v. Hopkins Ct. Apartments, L.L.C., 195 A.D.3d 1375, 1377 (2021) ("Section 12.1 of the partnership agreement does provide that the partnership 'shall be dissolved upon the happening of,' inter alia, the sale of the project. But, in that event, the dissolution does not occur until after the sale. The fact that a sale of the project triggers a dissolution, and thereafter a liquidation, does not mean that the sale and its proceeds are automatically included in the subsequent liquidation."); Saugatuck, LLC v. St. Mary's Commons Assocs., L.L.C., 2022 U.S. Dist. LEXIS 155657, at *22, 2022 WL 3699484, at *7 (E.D.N.Y. Aug. 26, 2022) ("LPA Section 12.1.D's language unambiguously lists 'the sale or other disposition of all or substantially all of the assets of the Partnership' as an event that 'cause[s] a dissolution.' Based on this reading, the Court concludes that, under the unambiguous contract language, the apartment sales and any dissolution triggered as a result are two separate events, and that the sale does not—in and of itself—automatically dissolve the Partnership. Because the apartment sales here and any triggering dissolution are two distinct events, the parties must first use LPA sections 9.2.B(i)-(ix) to properly allocate any proceeds before applying Section 12.4 to distribute any remaining funds.") (internal citations omitted).

Notably, the Limited Partners fail to explain in their briefing how, under their interpretation of the LPAs, there could ever be a distribution of "Sale . . . Proceeds" under Section 9.2, even though the LPAs plainly direct that "Sale or Refinancing Transaction Proceeds" be distributed pursuant to Section 9.2. If the sales of the Properties and the dissolution and liquidation of the Partnerships are the same thing, as opposed to separate and distinct events, there would be no need to reference "Sale . . . Proceeds" being distributed under Section 9.2, because all such proceeds would be distributed under Section 13.4. "[P]arties to a contract will not be imputed with using language that is meaningless or without effect." Once Upon A Time, 209 So. 3d at 1098 (quotations omitted); see also Hopkins Court, 195 A.D.3d at 1377 ("We further conclude that plaintiffs' interpretation of the partnership agreement—that any sale of the project results in an immediate dissolution of the partnership that would, in effect, predate the sale and require section 12.4(A) [(governing distribution of liquidation proceeds)] to control the distribution of its proceeds—would impermissibly operate to render portions of the partnership agreement meaningless."); CED Capital Holdings X, Ltd. v. CTCW-Waterford East LLC, 2022 WL 1717946, at *11 (Fla. Cir. Ct. May 12, 2022) ("[I]t is axiomatic that if Section 4.2 governs the distribution of hypothetical proceeds from a property sale (as the 5th District Court of Appeal affirmed in the Berkshire

21

Litigation) then it necessarily follows that Section 4.2 governs the distribution of proceeds from a sale of the property because concluding otherwise would . . . render Section 4.2 meaningless, superfluous and inoperable, which would result from adopting CTCW's misplaced arguments to skip the distribution of sales proceeds under Section 4.2 and proceed directly to Article 10 of the LPA where remaining Partnership assets (not sale proceeds) are to be liquidated after the distribution of proceeds under Section 4.2 occurs.").

In contrast, the General Partners' construction of the LPAs – that the "[s]ubject to Section 13.4" language in Section 9.2 means that if the sales of the Properties were to occur as part of the liquidation process (rather than as an event triggering dissolution and liquidation as in this case), then Section 13.4 controls the distribution of the proceeds rather than Section 9.2 – harmonizes both sections and gives meaning and effect to all relevant provisions of the LPAs. See Hopkins Court, 95 A.D.3d at 1377 ("The fact that section 9.2(B) is made expressly '[s]ubject to the provisions of' section 12.4 simply means that the project could be sold during the dissolution process and provides in that event for the distribution of the proceeds pursuant to section 12.4(A).").

To support their position, the Limited Partners rely heavily on the Middle District of Alabama's holding in Hall Hous. Invs.,

Inc. v. 1997 Fund XV Series E, Ltd., 2022 U.S. Dist. LEXIS 148869, 2022 WL 3580755 (M.D. Ala. Aug. 19, 2022). (See Doc. 32 at 1-2, 13-16; Doc. 50 at 2-3, 9-10). This is understandable, since Hall Housing was decided in the same posture as the instant case and involved a similar dispute over how the proceeds from the sale of an affordable housing apartment complex were to be distributed among the partners under a partnership agreement governed by Alabama law. See Hall Housing, 2022 U.S. Dist. LEXIS 148869, at *1-7, 2022 WL 3580755, at *1-3.

However, despite its surface similarities to the instant case, Hall Housing does not govern the outcome here. Significantly, the Hall Housing court made only passing, indirect reference to Section 16.4 of the relevant partnership agreement, which governed "Distribution of Cash from Refinancing and Cash From Sale" and is analogous to the "Distribution and Application of Sale or Refinancing Transaction Proceeds" waterfall in Section 9.2 here. See Hall Housing, 2022 U.S. Dist. LEXIS 148869, at *8 n.3, 2022 WL 3580755, at *3 n.3; (Doc. 43-2 at 64). Indeed, unlike this case, the general partner in Hall Housing did not argue that the "Cash from Sale" waterfall should apply to the distribution of sale proceeds, since Section 16.4 required that the limited partner be paid 115% of its capital contribution, which would have resulted

in the limited partner receiving all the proceeds.[6] See Hall Housing, 2022 U.S. Dist. LEXIS 148869, at *5, 10, 2022 WL 3580755, at *2, 4; (Doc. 43-2 at 64). Instead, the general partner argued that Section 16.1.1, which governed "Distributable Cash from Operations" and is analogous to the "Distribution and Application of Cash Flow" waterfall in Section 9.1 here, applied. See Hall Housing, 2022 U.S. Dist. LEXIS 148869, at *5, 10, 2022 WL 3580755, at *2, 4; (Doc. 43-2 at 63). As in this case, the limited partner argued that the dissolution and liquidation sections of the partnership agreement required the sale proceeds to be distributed "in accordance with the Partner's respective positive Capital account balances." See Hall Housing, 2022 U.S. Dist. LEXIS 148869, at *4-5, 2022 WL 3580755, at *2; (Doc. 43-2 at 55-56). Alternatively, the limited partner (represented by the same counsel as the Limited Partners in this case) argued that the "Cash from Sale" waterfall should apply. Hall Housing, 2022 U.S. Dist. LEXIS 148869, at *8 n.3, 2022 WL 3580755, at *3 n.3.

However, unlike in this case, where the LPAs define "Sale or Refinancing Transaction Proceeds" as "all cash receipts of the Partnership arising from a Sale or Refinancing Transaction" minus certain transaction-related expenses and debt payments (see Doc. 21-1 at 24; Doc. 21-2 at 24), the partnership agreement in Hall

---

[6] There is no such return of capital provision in the LPAs at issue here. (See Docs. 21-1, 21-2).

Housing defined "Cash from Sale" as "the cash realized by the Partnership from a sale of **all or any part of the Project** or other assets of the Partnership where the gross proceeds of such event exceeds $10,000," but the last sentence of the same definition section stated that "[t]he term **Cash From Sale does not apply to any sale** or other disposition **of all of the Project**." (See Doc. 43-2 at 28 (bold added)); see also Hall Housing, 2022 U.S. Dist. LEXIS 148869, at *8, 2022 WL 3580755, at *3 ("The Partnership Agreement at issue here, although long and detailed, is not a model of clarity. For example, according to the first sentence of its definition, 'Cash from Sale' applies to sale of 'all or any part of the Project,' but, according to the last sentence of the same section, does not apply to sales of 'all of the Project.'"). The Hall Housing court did not attempt to "reconcile" this apparently contradictory contract provision. Hall Housing, 2022 U.S. Dist. LEXIS 148869, at *8 n.3, 2022 WL 3580755, at *3 n.3. The court also rejected the general partner's plainly incorrect argument that the proceeds from the sale of the project were "Cash from Operations." Id., 2022 U.S. Dist. LEXIS 148869, at *10, 2022 WL 3580755, at *4. Instead, in an effort to "uphold, rather than destroy, the contract and . . . give effect and meaning to all of its terms," the Hall Housing court accepted the limited partners' more plausible construction and concluded "that the sale of the Project and the payment of the proceeds into escrow was a

termination requiring distribution under [the liquidation waterfall]." Id., 2022 U.S. Dist. LEXIS 148869, at *11-13, 2022 WL 3580755, at *4-5.

Thus, notwithstanding its holding, the Hall Housing court construed materially different contractual provisions and consequently did not address the issue presented in this case, which is whether the proceeds from the sales of the Properties should be distributed under the "Sale or Refinancing Transaction Proceeds" waterfall or the dissolution and liquidation provisions of the particular LPAs at issue here. Accordingly, the undersigned finds Hall Housing to be distinguishable and not controlling of the outcome in the instant case.[7]

Finally, to the extent the Limited Partners' reference to federal tax law (see Doc. 32 at 15-16) can be construed to suggest

_____

[7] The Limited Partners maintain that the "out-of-circuit and non-binding caselaw" cited by the General Partners in support of their interpretation of the LPAs "are not binding, do not apply Alabama law, and are simply not helpful in this dispute because they concern different partnership agreements." (Doc. 50 at 6-7). However, though it applies Alabama law, Hall Housing is also not binding on this Court and concerns a partnership agreement materially different from the LPAs at issue here. See Georgia v. President of the United States, 46 F.4th 1283, 1304 (11th Cir. 2022) (noting that "a district court's decisions do not bind other district courts, other judges on the same court, or even the same judge in another case"). Moreover, the Limited Partners do not identify any principles of contract interpretation unique to Alabama law that would render the Hall Housing court's reasoning more persuasive than that of the courts in the cases cited by the General Partners which, unlike Hall Housing, addressed the dichotomy between a sales proceeds waterfall and the dissolution and liquidation provisions of a LIHTC partnership agreement.

that their interpretation of the LPAs is supported or compelled by the Internal Revenue Code and accompanying Treasury Regulations, the argument is waived for lack of development. See <u>Edwards-Conrad v. Massachusetts Mut. Life Ins. Co.</u>, 577 F. App'x 929, 930 (11th Cir. 2014) (per curiam) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it.") (quoting <u>Hamilton v. Southland Christian Sch., Inc.</u>, 680 F.3d 1316, 1319 (11th Cir. 2012)). The Limited Partners do not adequately explain how the Treasury Regulations they cite either compel or support their interpretation of the LPAs (<u>see</u> Doc. 32 at 15-16),[8] and it is not the Court's role to divine and flesh out the details of their inchoate arguments. See <u>Van Vechten v. Elenson</u>, 2013 U.S. Dist. LEXIS 100604, at *4-5, 2013 WL 3776273, at *1 (S.D. Fla. July 17, 2013) ("Parties cannot come into federal court and throw out issues, leaving it to the district court to flesh out the details. . . . 'Rather, the onus is upon the parties to formulate arguments,' to explain them adequately, and provide supporting

---

[8] The Court notes that in their response in opposition to the Limited Partners' motion for judgment on the pleadings, the General Partners addressed the Limited Partners' "passing suggestion that tax law . . . conflicts with the General Partners' interpretation of the LPAs" and cited case law in support of their contention that "this assertion is . . . one that has been repeatedly rejected by courts around the country." (Doc. 42). In their omnibus reply brief, the Limited Partners did not address the case law cited by the General Partners and made no further argument based on federal tax law. (<u>See</u> Doc. 50).

case law showing why they should win.") (quoting Resol. Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)). Additionally, the undersigned notes that courts in similar cases have rejected limited partners' arguments that federal tax law requires property sale proceeds to be distributed under partnership agreements' liquidation provisions in accordance with the positive account balances of the partners. See Full Circle, 2024 U.S. Dist. LEXIS 107882, at *16, 2024 WL 3043171, at *6 (finding that Treasury Regulations issued under Sections 704(b) and 752 of the Internal Revenue Code "do not apply to the distributions of sale proceeds because the Court finds that the LPA's unambiguous language makes a distinction between sale proceeds and subsequent liquidating distributions"); St. Mary's, 2022 U.S. Dist. LEXIS 155657, at *23-24, 2022 WL 3699484, at *8 (rejecting limited partner's argument "that a failure to distribute sale proceeds in a manner proportional to the parties' respective capital accounts would somehow run afoul of . . . the federal tax code"); CTCW-Waterford East, 2022 WL 1717946, at *7 (noting the court's continued rejection of the "unpersuasive" argument that "tax law (i.e., 24 C.F.R § 1.704-1(b)) dictates that any property disposition requires sale proceeds be distributed under [dissolution and liquidation provisions] in order to monetize the limited partner's positive capital account balance").

Because the proceeds from the sales of the Properties are "Sale or Refinancing Transaction Proceeds" that must be distributed pursuant to the Section 9.2 of the LPAs, the General Partners' motion for judgment on the pleadings is due to be granted, and the Limited Partners' motion for judgment on the pleadings is due to be denied.

## IV. CONCLUSION

Based on the foregoing, it is recommended that the General Partners' motion for judgment on the pleadings (Doc. 43) be **GRANTED**, and that the Limited Partners' motion for judgment on the pleadings (Doc. 32) be **DENIED.**

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was

informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **12th** day of **August, 2024.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**